**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA**
**Plaintiff,**

**v.** **Case No. 11-CR-72**

**CVIJAN SKILJEVIC and NEDELJKA SKILJEVIC**
**Defendants.**

---

**DECISION AND ORDER**

The government charged husband and wife defendants Cvijan Skiljevic (hereafter "Cvijan") and Nedeljka Skiljevic (hereafter "Nedeljka") with unlawfully procuring their naturalization as United States citizens.[1] Specifically, the indictment alleges that:

> 2. In procuring [his/her] naturalization, the defendant falsely swore in [his/her] Form N-400 (Application for Naturalization) that [s/he] had never lied to any United States government official to gain entry into the United States, and never gave false or misleading information while applying for any immigration benefit, or to prevent deportation, exclusion, or removal.
>
> 3. As the defendant well knew, [s/he] made material false statements under oath in her Refugee Application (Form I-590), and in [his/her] Lawful Permanent Resident Application (Form I-485). Specifically, the defendant lied about [his/her] service in the Army of the Republika Srepska (VRS) and [s/he] lied about where [s/he] was living during the years when [s/he] was serving in the VRS.
>
> All in violation of Title 18, United States Code, Section 1425(a).

(Indictment [R. 5] at 1-2.)

Defendants filed motions to suppress statements based on an unlawful traffic stop and Miranda violations, to dismiss the indictment based on an ambiguous question, to dismiss based on selective prosecution, and to suppress statements based on a violation of the rules

---

[1]I refer to defendants by their first names only to avoid confusion.

governing the International Criminal Tribunal for the Former Yugoslavia ("ICTY") and the Vienna Convention on Consular Relations ("VCCR"); Nedeljka moved to suppress physical evidence based on a defective search warrant. The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing on the first motion to suppress, then issued a recommendation that all of the motions be denied. Defendants object. My review is de novo. See Fed. R. Crim. P. 59(b).[2]

## I. MOTION TO SUPPRESS – TRAFFIC STOP / MIRANDA

### A. Facts

Defendants do not specifically object to the magistrate judge's recitation of the facts. I will therefore adopt the magistrate judge's factual summary (Recommendation [R. 84] at 6-11) and present an abbreviated version of events here.

Immigration and Customs Enforcement ("ICE") agents obtained a search warrant for defendants' apartment seeking documents and other evidence relating to their alleged military service and residence in Bosnia. The agents also wanted to question defendants and perhaps obtain their assistance in a matter overseas. As the agents arrived to execute the warrant at about 6:00 a.m. on March 15, 2011, they saw defendants' car leave the parking lot. Agents stopped the vehicle, driven by Cvijan, about a mile away from the apartment building and asked

---

[2]Defendants also filed (non-dispositive) motions for discovery (R. 22, 26, 38, 39), which the magistrate judge denied. Defendants do not seek review of that order, which is self-operating. See United States v. Brown, 79 F.3d 1499, 1503-04 (7th Cir. 1996). In their objections, defendants purport to adopt and reincorporate all of the arguments made in their submissions to the magistrate judge. However, the district court's obligation to conduct de novo review is triggered only by "specific written objections." Fed. R. Crim. P. 59(b)(2); see also United States v. O'Neill, 27 F. Supp. 2d 1121, 1126 (E.D. Wis. 1998); Banta Corp. v. Hunter Publ'g Ltd., 915 F. Supp. 80, 81 (E.D. Wis. 1995); United States v. Molinaro, 683 F. Supp. 205, 211 (E.D. Wis. 1988). In her objections, Nedeljka specifically addresses only the motion to suppress physical evidence obtained pursuant to the search warrant.

him to accompany the agents back to the apartment. Cvijan agreed, accepting a ride back to the apartment with the agents. Due to space constraints, the agents then asked Cvijan to accompany them to their office to answer some questions. Cvijan again agreed, and the agents drove him to an ICE office in Milwaukee. Upon arriving, agents directed Cvijan to a conference room, which contained a large table and approximately ten chairs. The interrogating agent (Stillings) testified that he could not remember whether the door remained open or closed, but Cvijan was not handcuffed or considered to be in custody during the questioning.

Stillings asked Cvijan, in English, to provide a statement, and Cvijan agreed. Stillings then read defendant his Miranda rights using a standard form. Stillings testified that Cvijan had a thick accent, but he appeared to understand what Stillings said to him. Stillings then questioned Cvijan about his immigration into the United States and his work and residence history in Bosnia. This questioning lasted from about 7:30 to 8:15 a.m.[3]

Meanwhile, back at defendants' apartment, the other agents (Engelhardt, Cerkic, and analyst McQueen) rang the bell, and Nedeljka answered the door and invited the agents inside. Agent Engelhardt testified that her "command of English was immediately apparent." (Evid. Hr'g Tr. at 85.) Engelhardt told Nedeljka he wanted to discuss her immigration documents, but he stated that the interview was completely voluntary, that she did not have to answer any of the questions, and that she could tell the agents to leave if she wanted. She agreed to talk to the agents. Engelhardt presented various immigration documents to Nedeljka, and she verified that she filled them out correctly. Engelhardt specifically pointed to the questions about military

[3]Agent Wrona was present for this portion of the interview, but he asked no questions. (Evid. Hr'g Tr. at 30.)

service, and Nedeljka verified that she did not participate in military service. Engelhardt testified that he had no trouble communicating with Nedeljka in English. (Id. at 99.)

Engelhardt then showed Nedeljka documents indicating that she had been a member of the VRS, after which her demeanor became more serious. Engelhardt told Nedeljka that she had not been truthful to him and that lying to a federal agent is a crime. He also explained that there was larger case outside of her own that he believed she knew something about. Nedeljka denied the information and stated that she did not see anything; she claimed that she had told Engelhardt the truth. She then became upset and stated that Muslims had killed her father. McQueen interjected that "he didn't give a fuck about her father" (id. at 114), and Nedeljka began to cry. McQueen reminded Nedeljka that she could ask them to leave.

Engelhardt testified that the dialogue began to break down at that point, and Agent Cerkic, a fluent Serbo-Croatian speaker, began to translate for Nedeljka. Engelhardt informed Nedeljka that they had a search warrant and asked if there were any items in the house linked to the VRS . Nedeljka stated that there was nothing in her home related to the VRS and that they could search. Engelhardt then called the United States Attorney's office, after which he decided to take Nedeljka into custody. Agents arrested Nedeljka and transported her to the federal courthouse for an initial appearance.[4]

At approximately 8:40 a.m., Engelhardt returned to the ICE office and met with Stillings, who advised him of the information obtained from Cvijan. Engelhardt then took over the interview, along with McQueen and Cerkic. Engelhardt immediately questioned Cvijan about his involvement with the VRS and presented documents including Cvijan's name on a roster

[4]The questioning of Nedeljka lasted about an hour. (Id. at 147.)

of VRS members involved in the Srebrenica massacre. Cvijan denied that he was a member and stated that there were "ghost soldiers" on the roster. (Id. at 124.) Engelhardt decided to start the interview over, with Cerkic translating. Cvijan again agreed to give a statement.[5] Through the course of this questioning, Cvijan admitted a history in the VRS and to making other false statements on his immigration documents. This questioning ended at about 10:00 a.m., after which an agent drove Cvijan back to his home. He was not arrested that day.

**B. Analysis**

Cvijan argued that the agents unlawfully stopped his car, and both defendants argued that the agents violated their rights under Miranda during their respective interviews.

**1. Vehicle Stop (Cvijan)**

The magistrate judge found that the agents had probable cause to stop Cvijan based on the evidence of immigration fraud set forth in the search warrant application. Probable cause exists when the police possess reasonably trustworthy knowledge of facts and circumstances that would warrant a reasonable person to believe that a suspect had committed or was committing a crime. Beck v. Ohio, 379 U.S. 89, 91 (1964). Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime; so long as the totality of the circumstances, viewed in a common sense manner, reveals a probability or substantial chance of criminal activity on the suspect's part, probable cause exists. United States v. Sawyer, 224 F.3d 675, 679 (7th Cir. 2000).

---

[5]Engelhardt did not re-read the Miranda warnings. Rather, using a "Record of Sworn Statement in Administrative Proceedings" form, he confirmed that Civajn was "willing to answer questions" and that his "statement must be freely given and voluntary." (Evid. Hr'g. Ex. D; Tr. at 125.)

I agree with the magistrate judge's analysis. Engelhardt's search warrant application set forth in detail the evidence agents had against Cvijan at the time of the traffic stop. (Evid. Hr'g Ex. M.) The affidavit alleged that Cvijan was a member of the ad hoc Bosnian Serb military assault group which carried out an attack on Srebrenica, during which thousands of Bosnian Muslim men and boys were killed. (Id. ¶¶ 5-9.) During the aftermath of the Bosnian war, officials recovered Cvijan's VRS military service record, indicating that he entered the VRS on May 25, 1992, and demobilized on March 15, 1996. (Id. ¶ 24.) Officials also recovered a roster of the "Tactical Group Command," which listed Cvijan as a rifleman in the 3rd Rifle Squad of the 1st Rifle Platoon of the 2nd Infantry Company of the Zvornik Brigade. McQueen, an expert on the historical facts of the Bosnian War (id. ¶ 15), advised that this tactical group led the attack on Srebrenica (id. ¶ 26). The affidavit further detailed Cvijan's alleged immigration fraud, averring that he lied about at least four material facts, including his residence and military service in Bosnia from 1992 to 1996. (Id. ¶ 29.) Based on these false statements, the affidavit alleged, Cvijan was admitted to the United States as a refugee. (Id. ¶ 30.) The affidavit further alleged that Cvijan repeated his false statements in an application for permanent legal resident status (id. ¶ 31) and in his application for United States citizenship (id. ¶ 32). Based on this affidavit, a magistrate judge found probable cause and issued a search warrant for defendants' residence to search for items relating to their military service and residence in Bosnia. And based on this showing of probable cause, Engelhardt lawfully directed that Cvijan's vehicle be stopped. See United States v. Parra, 402 F.3d 752, 764 (7th Cir. 2005) (holding that an arrest is proper so long as the knowledge of the officer directing the

arrest is sufficient to constitute probable cause).[6]

In his objections, Cvijan argues that the magistrate judge erred in finding that the agents had probable cause (or reasonable suspicion) to stop him. If the agents had probable cause, they should have secured an arrest warrant, he contends. However, "in the area of arrests made in a public place, an arrest warrant has never been considered to be constitutionally mandated even when there was opportunity for one to be obtained." United States v. Fernandez-Guzman, 577 F.2d 1093, 1097 (7th Cir. 1978); see also United States v. Chapman, 954 F.2d 1352, 1357 (7th Cir. 1992). Cvijan argues that the agents had only a hunch, based on questionable evidence obtain from unknown sources. He contends that there were no eyewitnesses, fingerprint evidence, or other proof regarding the documents upon which the agents relied. He further notes that he did not commit any crimes in the agents' presence, and none of them had personal knowledge that a crime had been committed. As discussed above, however, probable cause does not require certainty, only a substantial chance of criminal activity on the suspect's part, Sawyer, 224 F.3d at 679, and officers may rely on a wide range of information, including hearsay, in applying for a warrant, see, e.g., Illinois v. Gates, 462 U.S. 213, 238-39 (1983). The search warrant issuing magistrate judge found that the documents – combined with the other evidence presented – established probable cause, a determination defendants do not specifically contest,[7] and which supports the agents' decision to conduct a

---

[6]Engelhardt testified that as he arrived at the residence, Agent Bielke advised him that defendants' car left the parking lot. Engelhardt directed Bielke to stop the car. (Evid. Hr'g Tr. at 80.)

[7]As discussed later in this decision, Nedeljka mounts a different challenge to the search warrant – that the magistrate judge erred in finding probable cause that evidence of the alleged crime (such as military mementos) would be found in defendants' apartment. Neither defendant argues that the warrant application failed to establish probable cause of immigration

stop.

Cvijan argues that the stop constituted a knee-jerk reaction to a change in the situation, and that no exigency existed justifying the agents' conduct. However, as the magistrate judge also noted in his recommendation, officers may lawfully detain suspects during the execution of a search warrant. In Michigan v. Summers, the Supreme Court held:

> If the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home. Thus, for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted.

452 U.S. 692, 704-05 (1981) (footnotes omitted). Courts have applied the Summers rule in the present situation – when a suspect drives away as the officers are about to execute the warrant. See United States v. Bailey, 652 F.3d 197, 204-06 (2d Cir. 2011)[8] (citing United States v. Bullock, 632 F.3d 1004 (7th Cir. 2011); United States v. Cavazos, 288 F.3d 706 (5th Cir. 2002); United States v. Cochran, 939 F.2d 337 (6th Cir. 1991)); see also United States v. Montieth, 662 F.3d 660, 666-67 (4th Cir. 2011). Cvijan does not address Summers in his objections, and on this basis as well I find the agents' actions in stopping Cvijan a short distance from his home reasonable under the circumstances.

**2. Miranda/Voluntariness Claims**

In order to protect the right against self-incrimination, the police must advise an

---

fraud.

[8]The Supreme Court granted certiorari in Bailey earlier this week. 2012 WL 1969365 (U.S. June 4, 2012). However, even if the Court concludes that Summers does not apply when the individual has left the immediate vicinity of the premises before the warrant is executed, Cvijan's stop was nevertheless supported by probable cause.

individual of certain rights prior to subjecting him to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444 (1966). To implicate Miranda, the person must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F .3d 982, 987 (7th Cir. 1996). It is undisputed in the present case that both defendants were interrogated. The primary issue is whether they were "in custody" at the time.

A person is in custody for purposes of Miranda when his movement is restrained to the degree comparable to a formal arrest. Id. The determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury v. California, 511 U.S. 318, 323. In other words, "the only relevant inquiry is how a reasonable man in the suspect's shoes would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984). The court considers the totality of the circumstances in making this determination, including whether the encounter occurred in a public place, whether the suspect consented to speak with the officers, whether the officers informed the suspect that he was not under arrest and was free to leave, whether the suspect was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, whether the officers deprived the suspect of documents he needed to continue on his way, and whether the officers' tone of voice was such that their requests would likely be obeyed. United States v. Wyatt, 179 F.3d 532, 535 (7th Cir. 1999); see also United States v. Gravens, 129 F.3d 974, 977 (7th Cir. 1997) (noting that the accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors).

**a. Cvijan**

As indicated above, after stopping his vehicle, agents asked Cvijan to accompany them

back to his apartment, then to ICE offices, to answer some questions; Cvijan agreed, and an agent drove him to both locations. I concur with the magistrate judge that Cvijan was not in custody under these circumstances. The initial encounter occurred in a public place, and Cvijan agreed to accompany and speak with the agents. He was at no point handcuffed or told that he was under arrest. While he twice moved to different locations, he agreed to go to both. See United States v. Budd, 549 F.3d 1140, 1145 (7th Cir. 2008) (finding no custody where the suspect voluntarily agreed to go to the police station); United States v. Jones, 21 F.3d 165, 170 (7th Cir. 1994) (finding that the defendant was not subjected to custodial interrogation after he consented to go to police headquarters); see also Booker v. Ward, 94 F.3d 1052, 1058 (7th Cir. 1996) (finding that suspect who voluntarily agreed to interview and polygraph was not seized). The interview was relatively brief, occurring in a conference room rather than a holding cell or similar setting,[9] and at no point did the agents behave in a threatening manner. Cvijan was permitted to leave at the conclusion of the interview, with an agent driving him home.

In his objections, Cvijan argues that it was inconsistent for the magistrate judge to find that while a reasonable person would not initially have felt free to leave upon being stopped and driven back to his residence by law enforcement, the other circumstances cut against a finding of custody. Cvijan contends that if a reasonable person would not have felt free to leave at the outset, the inquiry stops there; once custody is present, Miranda requirements attach. Cvijan cites no authority in support of this contention, and the cases do not support it. See, e.g., Berkemer, 468 U.S. at 440 (holding that, for purposes of Miranda, "custody" does

---

[9]Stillings testified that he decided to conduct the interview at the ICE office on Milwaukee Street because it contained a nice, private conference room, rather than the ICE facility on Knapp Street, which housed the detention center. (Evid. Hr'g Tr. at 22-23.)

not begin during a traffic stop until formal arrest, even if the driver's freedom had been restrained earlier in the process); United States v. Burns, 37 F.3d 276, 281 (7th Cir. 1994) ("While detention during the execution of a search warrant is not a traditional Terry stop, it is sufficiently analogous for us to conclude that, in the usual case, Miranda warnings are not required.") (footnote omitted); see also United States v. Gupta, 183 F.3d 615, 617-18 (7th Cir. 1999) (declining to extend Miranda to immigration inspection and questioning, even though it involves "custody" until the individual has satisfied inspectors of his right to enter).

Cvijan also argues in his objections that the fact that agents read him the Miranda rights shows that they believed the warnings required, and that the provision of the warnings created a coercive atmosphere. He again provides no authority for this contention, and the Seventh Circuit has recognized that giving Miranda warnings to a suspect does not by itself convert an otherwise non-custodial detention into a custodial arrest under Miranda. See Sprosty v. Buchler, 79 F.3d 635, 642 (7th Cir. 1996); see also United States v. Kampiles, 609 F.2d 1233, 1242 (7th Cir. 1979).

In any event, even if Cvijan had been in custody during the interview, his claim would fail. As the magistrate judge explained, Stillings read Cvijan the Miranda rights, which Cvijan voluntarily and intelligently waived. (Recommendation at 17-23; Evid. Hr'g Ex. C.) The record contains no evidence that Stillings coerced Cvijan into a waiver, or that Cvijan failed to understand what he was doing. The record likewise shows that Cvijan's statement was voluntary, rather than the product of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome his free will. See Watson v. DeTella, 122 F.3d 450, 453 (7th Cir. 1997).

In his objections, Cvijan argues that it was error for Stillings to only give the

"administrative warning," which makes no mention of "criminal" proceedings. However, he cites no authority supporting the notion that the warnings Stillings provided, which indicated that any statement "can be used against you in court, or in any immigration or administrative proceeding" (Evid. Hr'g Ex. C at 1), were insufficient. See Florida v. Powell, 130 S. Ct. 1195, 1204 (2010) ("The four warnings Miranda requires are invariable, but this Court has not dictated the words in which the essential information must be conveyed.").[10]

Cvijan also argues that the magistrate judge erred in dismissing the use of Agent Cerkic, a Bosnian Muslim, as a translator. However, the record contains no evidence that Cerkic tried to intimidate or coerce Cvijan into making a statement, by playing up his ethnicity or any on any other basis. See United States v. Gillaum, 372 F.3d 848, 856 (7th Cir. 2004) (noting that coercive police activity is a necessary predicate to the finding that a confession is not voluntary). Cerkic's ethnicity and/or religion alone cannot make Cvijan's statement involuntary. Cf. United States v. Mendenhall, 446 U.S. 544, 558 (1980).[11]

Cvijan further argues that the magistrate judge erred in finding that language issues did

---

[10]As indicated earlier, when Engelhardt arrived and took over the questioning, he asked Cvijan the questions listed in the ICE "Record of Sworn Statement in Administrative Proceedings" form. (Evid. Hr'g Ex. D.) That form does not comply with Miranda. However, as the magistrate judge explained, this form did not contradict the proper warnings Stillings provided Cvijan less than two hours earlier, and there is no evidence suggesting that Cvijan failed to understand that he could decline to speak to Engelhardt. See United States v. Edwards, 581 F.3d 604, 606-07 (7th Cir. 2009) (explaining that warnings need not be repeated after breaks in the questioning, even when different officers take over, so long as the defendant when he gave the statement realized he had a right to remain silent).

[11]At the evidentiary hearing, Cerkic admitted that he came to the United States as a refugee from Bosnia. (Evid. Hr'g Tr. at 179.) However, his role in the questioning of Cvijan was simply to translate, and he testified to no difficulties in communicating with Cvijan. (Id. at 180-81.) While Cvijan may have realized Cerkic was a Bosnian Muslim, the record contains no evidence that Cerkic in any way sought to use such characteristics to coerce Cvijan into talking.

not impact his understanding of the Miranda rights. But Agent Stillings testified that he spoke to Cvijan in English throughout their dealings, and Cvijan appeared to understand him and never asked to communicate in his native language. (Evid. Hr'g Tr. at 18, 21, 23, 44-45, 52.) Specifically pertaining to the Miranda warnings, Stillings testified that Cvijan had no trouble understanding and responded in English. (Id. at 27-28.) During the portion of the interview conducted by Engelhardt, the agents used a translator; other than his complaint about Cerkic's ethnicity, Cvijan makes no argument that Cerkic failed to interpret accurately.

Finally, Cvijan argues that the magistrate judge erred in finding that the warnings provided by Stillings and Engelhardt were not inconsistent. As indicated above, there is no requirement that an officer taking over an interview after a break provide fresh warnings. Further, nothing Engelhardt said was inaccurate or undermined the Miranda warnings previously provided by Stillings.

**b. Nedeljka**

Nedeljka invited the agents inside her home and agreed to speak with them. The agents made clear that the interview was voluntary, that she did not have to answer any of their questions, and that she could ask the agents to leave if she wanted. She was not during the questioning handcuffed or otherwise restrained, and the agents did not draw their weapons. I agree with the magistrate judge that, under these circumstances, Miranda did not apply.[12]

---

[12]For similar reasons, her statements were voluntary, rather than the product of police coercion. See Watson, 122 F.3d at 453. Before the magistrate judge, Nedeljka argued that the use of a Bosnian Muslim interpreter created a coercive atmosphere, but she pointed to no coercive conduct on Cerkic's part. See United States v. Ambrose, 668 F.3d 943, 955 (7th Cir. 2012) ("Coercive police activity is a necessary predicate to determining that a confession is involuntary."). She further argued that the agents intimidated her by arriving early in the morning with a number of armed agents. However, as discussed in the text, the agents never drew their weapons or otherwise threatened Nedeljka.

See, e.g., Beckwith v. United States, 425 U.S. 341, 347 (1976) (holding that interview in suspect's home did not implicate Miranda); United States v. Thompson, 496 F.3d 807, 811 (7th Cir. 2007) (finding that the defendant was not in custody where he invited the agents into his home and agreed to be questioned, and the agents did not raise their voices or display their weapons in an intimidating manner). It is true that things became somewhat tense towards the end of the interview, especially after McQueen made the remark about Nedeljka's father. However, McQueen immediately followed up this comment with a repeat admonition that Nedeljka could ask the agents to leave and discontinue her statement. I cannot conclude that this exchange created the coercion necessary to transform the interrogation into a custodial one. In any event, the interview ended shortly thereafter, and it appears that Nedeljka made no incriminating statements.[13]

## II. MOTION TO DISMISS – AMBIGUOUS QUESTION

As indicated above, the indictment alleges that defendants violated § 1425 when they falsely swore in their applications for naturalization that they had never lied to any United States government official to gain entry into the United States, and never gave false or misleading information while applying for any immigration benefit. These statements were false, the indictment alleges, because defendants made materially false statements about their residence and military service in their refugee application forms and lawful permanent resident applications (called an "I-485").

In motions to dismiss, defendants argued that the I-485 posed an ambiguous question when it asked them to list "any foreign military service." They argued that this question could

---

[13]Nedeljka does not in her objections specifically address the magistrate judge's conclusion on this motion.

be construed to refer to military service foreign to Bosnia/Serbia, rather than foreign to the United States. This ambiguity was compounded, defendants argued, by the language barrier.

I agree with the magistrate judge that this issue is not properly resolved via pre-trial motion to dismiss the indictment. Under Fed. R. Crim. P. 7(c)(1), the indictment need only "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." "In order for an indictment to be sufficient, it must identify the elements of the crime, fairly inform the defendant of the charge so that he may prepare a defense, and enable the defendant to evaluate any double jeopardy problems." United States v. Phillips, 645 F.3d 859, 861 (7th Cir. 2011). There is no indication – and defendants do not seriously claim – that the present indictment fails to satisfy these standards. Rather, defendants argue, based on evidence outside the indictment (i.e., the contents of the I-485), that the case must be dismissed. However, at the pre-trial stage, "the indictment ordinarily should be tested solely by its sufficiency to charge an offense, regardless of the strength or weakness of the government's case." United States v. Risk, 843 F.2d 1059, 1061 (7th Cir. 1988). A defendant may not, via pre-trial motion, challenge the sufficiency of the government's proof. See United States v. Yasak, 884 F.2d 996, 1001 (7th Cir. 1989) ("A motion to dismiss is not intended to be a 'summary trial of the evidence.'"); see also Fed. R. Crim. P. 12(b)(2) (stating that the court must be able to decide pre-trial motions "without a trial of the general issue"). A defense to the charge may be determined prior to trial if it involves questions of law rather than fact; however, if the pretrial defense claim "is substantially intertwined with the evidence concerning the alleged offense, the motion to dismiss falls within the province of the ultimate finder of fact." Yasak, 884 F.2d at 1001 n.3.

As the magistrate judge explained, the instant indictment states an offense, and the

specific question at issue – whether defendants previously lied or provided false or misleading information to immigration authorities – is not ambiguous. Pre-trial motions are not the proper vehicle for litigating whether defendants properly understood anterior questions to which they allegedly provided false answers.[14]

In his objections, Cvijan argues that the magistrate judge erred because the question found within the naturalization application must be read in conjunction with the question on the I-485; and the evidence is sufficient, he contends, for the court to find the I-485 query regarding "foreign military service" ambiguous. He further argues that, had the statute of limitations not run on the I-485 offense, the court would only be inquiring into that specific question; the fact

---

[14]Defendants argued before the magistrate judge that the indictment failed to properly allege that the misstatements/omissions were material, i.e., that they had a natural tendency to produce the conclusion that they were qualified for citizenship. See Kungys v. United States, 485 U.S. 759, 771-72 (1988). Specifically, defendants argued that the indictment failed to allege that, had they disclosed their military service and residence in the mid-1990s, they would have been found ineligible. Defendants do not specifically renew this argument in their objections. In any event, an indictment need not "exhaustively recount the facts surrounding the crime's commission," United States v. Agostino, 132 F.3d 1183, 1189 (7th Cir. 1997), or provide the details of how it will be proved, id. at 1191. The court in deciding a motion to dismiss asks not whether the indictment alleges sufficient facts from which a jury could find the defendant guilty, but whether the government could conceivably produce sufficient evidence at trial; accordingly, the court will dismiss an indictment only if the government's inability to prove its case appears convincingly on the face of the indictment. United States v. Segal, 299 F. Supp. 2d 840, 844 (N.D. Ill. 2004) (citing United States v. Castor, 558 F.2d 379, 384 (7th Cir. 1977)). Defendants themselves provided one hypothetical impediment to naturalization based on their alleged VRS service – the so-called "persecutor bar." They argued that the bar does not apply in this case but failed to specifically explain why. In any event, such an argument, heavily fact dependent, is also not properly addressed as a matter of law on a motion to dismiss. Finally, defendants argued that the indictment was time-barred, but as the magistrate judge explained, § 1425 offenses (as opposed, perhaps, to violations of 18 U.S.C. § 1546, which may cover lies on an I-485), carry a 10-year limitations period, within which their alleged crimes easily fall. See 18 U.S.C. § 3291. Defendants also fail to renew this argument in their objections. Nedeljka offers no specific objection to this portion of the magistrate judge's recommendation at all. Cvijan's specific objections are discussed in the text following this footnote.

that the government is using a broad question on the naturalization application to prosecute an offense that would otherwise be time-barred requires the court to consider the underlying question.

However, Cvijan cites no authority in support of his argument that the court should, on a motion to dismiss, delve into the evidence in this fashion. The indictment properly alleges that defendants procured citizenship by making material false statements, and Cvijan's attempt to put before the court material outside the four-corners of the indictment (such as the contents of the I-485) in order to demonstrate its insufficiency must be rejected. See United States v. DiFonzo, 603 F.2d 1260, 1263 (7th Cir. 1979).

## III. MOTION TO DISMISS – SELECTIVE PROSECUTION

Defendants also moved to dismiss on the grounds of selective prosecution, arguing that the government has failed to prosecute Bosnian Muslims, instead targeting Bosnian Serbs such as themselves. The government retains broad discretion in determining who to prosecute and what charges to bring. Wayte v. United States, 470 U.S. 598, 607-08 (1985). So long as the prosecutor has probable cause to believe that the accused committed an offense, the decision whether to prosecute generally rests entirely in his discretion. Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). The prosecutor's discretion is subject to constitutional restraints, and charges may not be brought based on the defendant's race or religion. United States v. Armstrong, 517 U.S. 456, 464 (1996). However, the defendant bears a heavy burden in making such a constitutional challenge to his prosecution. In order to sustain a charge of selective prosecution, the defendant must show that (1) he was singled out for prosecution while other violators similarly situated were not prosecuted; and (2) the decision to prosecute him was based on an arbitrary classification such as race or religion. United States v.

Monsoor, 77 F.3d 1031, 1034 (7th Cir. 1996). He must establish that the federal prosecutorial policy had a "discriminatory effect" and was motivated by a "discriminatory purpose." Armstrong, 517 U.S. at 465. In order to obtain discovery on such a claim, the defendant must produce some evidence that similarly situated defendants of other races could have been prosecuted but were not. Id. at 469. To obtain a hearing on a claim of selective prosecution, the defendant must offer sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment. Monsoor, 77 F.3d at 1034; United States v. Napue, 834 F.2d 1311, 1329 (7th Cir. 1987).

As the magistrate judge explained, defendants have failed to meet these standards. While they presented evidence that both sides engaged in atrocities during the conflict in the former Yugoslavia, they presented no evidence that Bosnian Muslims who engaged in such conduct sought admission to the United States, lied on their immigration papers, had their fraud detected, yet were not prosecuted. Nor, as the magistrate judge explained, is defendants' speculation that such persons must exist sufficient to warrant discovery or an evidentiary hearing under Armstrong.

In his objections, Cvijan argues that the magistrate judge ignored the fact that immigration records are confidential, precluding him from making any additional showing absent further discovery. Courts have rejected such "Catch-22" arguments against application of the Armstrong standards. E.g., United States v. Thorpe, 471 F.3d 652, 662-63 (6th Cir. 2006); see also United States v. Bass, 536 U.S. 862, 863-64 (2002) (declining to lower the threshold for discovery set forth in Armstrong, and holding that a defendant who seeks discovery on a claim of selective prosecution must submit relevant evidence that similarly situated persons were treated differently). Cvijan argues that he met his burden to the extent

possible, showing that many Bosnian Muslims and Serbs came to the United States following the war, and that a large number of Bosnian Serbs have been prosecuted. However, as he concedes, he fails to produce any evidence that Bosnian Muslims (or any other identifiable group) have evaded prosecution despite lying on their immigration papers. Conjecture that there must be Bosnian Muslims who failed to disclose military service on their applications does not suffice.

## IV. MOTION SUPPRESS – ICTY/VCCR

Defendants also moved to suppress their statements based on violation of the rules governing the ICTY and the protections of the VCCR. Defendants argued that the agents knew they were citizens of Bosnia, yet failed to advise them of their rights to consular notification under the Vienna Convention, which they would have exercised had they been so advised. They further argued that the agents were acting as agents for the ICTY prosecutor when they questioned defendants and as such were required to comply with ICTY rules, including the provisions requiring a certified interpreter and audio or video recording of statements.

As the magistrate judge noted, defendants were citizens of the United States at the time they were questioned, and they cited no authority for the proposition that a naturalized U.S. citizen retains the right to notification of consular officials from his or her country of origin. As the magistrate judge also noted, while the ICE agents may have hoped to have defendants cooperate with the ICTY prosecutor, there is no evidence that they were acting as agents of the ICTY when they questioned defendants. Nor, as the magistrate judge further noted, is there any authority for imposing the remedy of suppression of evidence in an American court for an alleged violation of ICTY rules.

In his objections, Cvijan argues that the magistrate judge erred in recommending denial

of these motions without an evidentiary hearing. However, he provides no indication of the evidence he would present at such a hearing or how it might change the outcome. See United States v. Curlin, 638 F.3d 562, 564 (7th Cir. 2011) ("District courts are required to conduct evidentiary hearings only when a substantial claim is presented and there are disputed issues of material fact that will affect the outcome of the motion."). In order to obtain a hearing, a defendant's "allegations and moving papers must be 'sufficiently definite, specific, non-conjectural and detailed,'" and he "bears the burden of both identifying a definite disputed factual issue, and demonstrating its materiality." Id. (quoting United States v. McGaughy, 485 F.3d 965, 969 (7th Cir. 2007)). Cvijan fails to satisfy these standards.

Cvijan further argues in his objections that the magistrate judge erred in finding that he could not hold "dual citizenship." He states that it is common for people to hold U.S. and other passports. However, he again fails to cite any authority for the proposition that the VCCR applies to a naturalized United States citizen questioned by U.S. agents on American soil. Absent some authority that the Convention even applies here, there is no reason to hold an evidentiary hearing (or to further discuss whether defendants could obtain the suppression remedy they seek, see Sanchez-Llamas v. Oregon, 548 U.S. 331 (2006)).

Finally, Cvijan argues that the magistrate judge erred in his conclusion regarding violations of the ICTY. He argues that additional testimony is needed to support any findings or conclusions in this regard, and that an evidentiary hearing should be held on these issues. Again, however, he fails in his objections to specify what sort of evidence he would present at such a hearing or how it might change the outcome. Accordingly, he is not entitled to a hearing. See Curlin, 638 F.3d at 564. Nor does he provide any authority for applying ICTY rules in this court, even if the ICE agents were acting as proxies for the ICTY prosecutor.

## V. MOTION TO SUPPRESS PHYSICAL EVIDENCE – SEARCH WARRANT

Nedeljka (alone) moved to suppress physical evidence seized pursuant to the search warrant executed at her residence, which authorized agents to seize "documents, writings, correspondence, and memorabilia relating to Cvijan Skiljevic's and Nedeljka Skiljevic's military service and residency in Bosnia, copies of documents relating to false statements made by the Skiljevics to Immigration authorities and documents relating to the Skiljevics' residency at the above-described residence." (Evid. Hr'g Ex. M at 1.) Nedeljka argued that the warrant application failed to establish probable cause that such items would be located in her home. Specifically, she argued that the affidavit failed to establish that the nature of her role in the military (administrative rather than combat) was such that she would likely maintain mementos of her service (as did the other individuals involved in the Bosnian war referenced in the warrant affidavit. (Id. ¶ 43.)).

The task of a magistrate considering a warrant application is to make a practical, common-sense decision about whether the evidence in the record shows a fair probability that contraband or evidence of a crime will be found in a particular place. United States v. Miller, 673 F.3d 688, 692 (7th Cir. 2012) (citing Gates, 462 U.S. at 240-41). A court reviewing an initial finding of probable cause to support the search warrant does not decide the question of probable cause de novo but gives "great deference" to the issuing magistrate's determination so long as the magistrate had a "substantial basis" for the finding. Id. at 692-93; United States v. McIntire, 516 F.3d 576, 578 (7th Cir. 2008). Even if the reviewing court finds the warrant deficient, suppression need not be ordered if the officers executed the warrant in "good-faith" reliance on the magistrate's probable cause determination. See United States v. Leon, 468 U.S. 897, 923 (1984).

The magistrate judge had a substantial basis for issuing the search warrant for defendants' residence. The affidavit sets forth in detail the evidence of Nedeljka's wartime service (id. ¶¶ 12-18) and of her alleged immigration fraud (id. ¶¶ 20-23), and she does not take issue with the sufficiency of the affidavit to state probable cause that she committed the crime alleged. Further, I cannot accept her argument that the affidavit failed to establish a sufficient basis for concluding that evidence of the crime would be found in her home. Nedeljka argued for a more particularized showing that she would be likely to retain records of her military service, as the others mentioned in affidavit did. She asks too much. Common sense supports the notion that one would likely retain evidence of such an important aspect of one's life as military service, and as the Seventh Circuit recently explained: "When probable cause exists to believe an individual has committed a crime involving physical evidence, and when there is no articulable, non-speculative reason to believe that evidence of that crime was not or could not have been hidden in that individual's home, a magistrate will generally be justified in finding probable cause to search that individual's home." United States v. Aljabari, 626 F.3d 940. 946 (7th Cir. 2010), cert. denied, 131 S. Ct. 2164 (2011); see also United States v. Abboud, 438 F.3d 554, 572 (6th Cir. 2006) ("One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home."). Further, courts regularly uphold warrants based on the affiant's experience as to where similar suspects keep and maintain evidence of their alleged crimes. See, e.g., United States v. McClellan, 165 F.3d 535, 546 (7th Cir. 1999); United States v. Lamon, 930 F.2d 1183, 1189 (7th Cir. 1991).[15]

---

[15]The warrant also sought evidence of Cvijan's military service. According to the affidavit, he served in a combat role, so Nedeljka's argument would not apply to him. Cvijan

In her objections, Nedeljka argues that the magistrate judge failed to acknowledge the search warrant's lack of a connection between the fact of her prior military service in a foreign country and the current presence of military documents in the home. She notes that a search warrant application must provide something more than mere supposition that the evidence sought is actually in the place to be searched. But the instant affidavit includes a detailed recitation of why, based on the affiant's training and experience and the results of numerous ICE searches in similar cases, such evidence could be found in Nedeljka's home. No more is required.

Nedeljka further argues that a court would not, in a drug case, issue a warrant based on (1) evidence that the suspect was convicted of a drug distribution offense in the past, and (2) the agent's training and experience that drug dealers store drugs, money, weapons, and drug ledgers in their houses. Her hypothetical is inapposite, for the instant case pertains to a completed offense, not ongoing drug activity. Considering the application in a common-sense manner, the issuing magistrate could conclude that a person would likely keep mementos or other evidence of past military service or of past residence in a different country in her current home. Nedljka notes that the application contains no statements from informants or law enforcement officers who have been in her home and are aware of the presence of the documentary evidence sought by the search warrant, or of any trash searches revealing such evidence. But this level of certainty is not required, just a reasonable belief that a search will turn up evidence of criminal activity. See, e.g., United States v. Brack, 188 F.3d 748, 755 (7th Cir. 1999).

---

does not challenge the search warrant.

Finally, even if the warrant was deficient, the agents could have relied on it in good faith. The agent's decision to apply for the warrant constitutes prima evidence of good faith, United States v. Otero, 495 F.3d 393, 398 (7th Cir. 2007), and the record contains no evidence that the issuing magistrate abandoned his neutral, detached role; that the agent was dishonest or reckless in preparing the affidavit; or that the agents could not have harbored an objectively reasonable belief in the existence of probable cause, United States v. Pless, 982 F.2d 1118, 1126 (7th Cir. 1992). Nedeljka cites no case in which a court found a materially similar affidavit insufficient, and she makes no argument that the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant. See United States v. Koerth, 312 F.3d 862, 869 (7th Cir. 2002).

## VI. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 84) is adopted, and defendants' motions (R. 19, 20, 21, 23, 24, 25, 40, 41, 42, 48, 50, 51, 72, 73, 74) are **DENIED**.

**IT IS FURTHER ORDERED** that this case is scheduled for counsel-only **STATUS** on **Tuesday, June 12, 2012, at 3:15 p.m.**

Dated at Milwaukee, Wisconsin, this 7th day of June, 2012.

/s Lynn Adelman
______________________________
LYNN ADELMAN
District Judge